## Case No. 6,769.

### HOWE v. MORTON et al.

[1 Fish. Pat. Cas. 586; [1] 23 Law Rep. 70.]

Circuit Court, D. Massachusetts. March 8, 1860.

PATENTS—INFRINGEMENT—ADDITIONS OR MODIFICATIONS—FOREIGN PATENTS—INJUNCTION—BOND OF INDEMNITY.

1. No matter what additions to, or modifications of, a patentee's invention a defendant may have made, if he has taken what belongs to the patentee he has infringed, although with his improvements the original machine may be much more useful.

[Cited in McComb v. Brodie, Case No. 8,708; Converse v. Cannon, Id. 3,144; Strobridge v. Lindsay, 2 Fed. 694.]

2. Howe's first claim is substantially the same as if he had said: "I claim the forming of the seam by a combination and arrangement of parts as hereinbefore described," i. e., of the parts necessary for the accomplishment of the end.

3. Where the want has always existed, and not only existed but been pressing, and it is said that an old instrument would always have answered the want, the improbability is so great as to require strong evidence to overcome it.

4. A foreign patent, to destroy a patent granted in this country, must have been granted be-

[1] [Reported by Samuel S. Fisher, Esq., and here reprinted by permission.]

fore the invention here, not merely before the application for letters patent.

5. An invention is not "patented" in England within the meaning of the acts of congress until the specification is enrolled. The enrolled specification takes effect only from the date of its enrollment, and not from the date of the filing of the provisional specification.

[Cited in Goff v. Stafford, Case No. 5,504; American Diamond Rock-Boring Co. v. Sheldon, Id. 297; Ireson v. Pierce, 39 Fed. 798.]

6. A patent having but six months to run, the defendants were allowed to give bond with sureties to account and pay damages, if any were awarded, in lieu of a preliminary injunction.

[Cited in Potter v. Whitney, Case No. 11,341; Morris v. Lowell, Id. 9,833; Hoe v. Boston Daily Adv. Corp., 14 Fed. 916.]

7. The defendant will be allowed to give bond with security to account, etc., when his machine embraces improvements which could not be used without using the original invention of the patentee upon which they were ingrafted.

[Cited in Consolidated Roller-Mill Co. v. Coombs, 39 Fed. 803; Campbell Printing-Press & Manuf'g Co. v. Manhattan Ry. Co., 49 Fed. 933.]

These were motions for provisional injunctions in two cases, to restrain the defendants [Albert Morton and others and Charles W. Williams] from infringing letters patent [No. 4,750] for an "improved sewing machine," granted to Elias Howe, Jr., September 10, 1846. The claims of the patent will be found in the report of the case of Howe v. Underwood [Case No. 6,775].

T. Giles and B. R. Curtis, for complainant.
A. C. Washburn, H. F. Durant, and C. Cushing, for defendants.

SPRAGUE, District Judge. I will now state the result at which I have arrived in both cases. As the matters involved in these two cases are complicated, and as I have no notes, and speak from memory merely, I may omit some of the considerations which have brought me to the conclusion at which I have arrived. I believe, however, that I can state the reasons of my decision sufficiently to enable the counsel to understand the most material grounds upon which I proceed.

Here are two applications for preliminary injunctions, made to the court at the same time, in two distinct suits, founded on Howe's sewing machine patent, dated September 10, 1846. One suit is against the Williams machine, so called, and the other is against three different machines, called respectively the Sloat, the Johnson, and the Gibbs machine.

The defense relied upon is, that there is no infringement. The validity of Howe's patent is conceded. It is not impeached for the want of novelty, or as embracing too much in its claim of invention; nor is it contended that it does not embrace all that he did, in fact, invent.

The question is, whether the defendants have infringed. The various patents introduced, granted prior to this of Howe, have been introduced not to show his patent to be invalid for want of novelty, but to ascertain what there is new in it, by showing what was before known.

The inquiry is, what is there in common between the defendants' machines and the Howe machine, which is not in common between the Howe machine and the prior ones? or, in other words, what do the defendants use that belongs to Howe? It being taken for granted that whatever is new in Howe's machine belongs to him, and is secured by his patent; and it being insisted that nothing of that which is new and secured by his patent, is used by the defendants in their machines. So that it is the question whether the defendants do use what belongs to Howe by his patent.

And here I would remark that this inquiry excludes various matters which have, properly enough, been gone into, as to the diversities between the defendants' and Howe's machines. No matter what the diversities are; or what additions to or modifications of Howe's original invention have been made by the defendants, if these new improvements are ingrafted upon Howe's invention, secured to him by his patent. The defendants may have taken Howe's machine as the basis and means from which to make their improvements. If they have taken what belongs to Howe, they have infringed, although with the improvements the machine may be much more useful than it would be without them. This is a well-known principle of patent law.

We are to inquire what there is in the defendants' machines that is taken from Howe's; and this induces the necessity of a comparison, in the first place, between Howe's patent and what was prior, in order to determine what there is in Howe's that is novel.

In examining Howe's patent, let us look, in the first place, at the summing-up, the first claim in which is as follows: "The forming of the seam by carrying a thread through the cloth, by means of a curved needle on the end of a vibrating arm, and the passing of a shuttle, furnished with its bobbin, in the manner set forth, between the needle and the thread which it carries, under a combination and arrangement of parts substantially the same with that described."

It is with this general claim that I shall have to deal. In giving a construction to a claim we must look at the specification which precedes it: and this is especially necessary in this case, because the claim makes express reference to the specification.

The summing-up begins by claiming the forming of the seam. That is a result. The real claim, as subsequently stated, is for the means by which that result is reached, namely, by carrying a thread through the cloth, by means of the needle at the end of the vibrating arm, and then carrying the

shuttle with its bobbin between the needle and its thread, under a combination and arrangement of parts substantially as described.

Some discussion has been had, whether this is to be deemed a claim for a combination, or a claim for a machine. I do not think it necessary to classify this claim, and to draw deductions from such classification. That is generally an unsafe mode of reasoning. I shall deal with the language of the claim and the specification as I find them, and apply the principles of law.

The patentee uses the words "combination and arrangement." I shall use the word "combination," not in any special sense, but as expressing a union of parts, co-operating to produce one result. Now, that claim would be substantially the same as it is, if it had used merely the latter part—if it had said: "I claim the forming of the seam by a combination and arrangement of parts, as hereinbefore described." Of what parts? The parts necessary for the accomplishment of the end. It specifies some of those parts in the beginning of the summing-up, namely: the needle carrying its thread through the cloth; the shuttle carrying its thread between the needle and its thread; and then, without any further specification of the parts, says, "under a combination and arrangement of the parts substantially as herein described." It specifies the needle and shuttle, and shows that these are some of the parts to be taken into view in the claim. But suppose it had omitted that enumeration of parts, and had said: "I claim the forming of the seam, by a combination and arrangements of parts substantially as herein described." When we look at the previous description we see that the needle and its thread, and the shuttle and its thread, are a part of the previous description, and therefore, would be embraced in a general statement that he claims that combination and arrangement of the parts of the machine, substantially as described, used for the purpose of forming the seam.

Looking at it then, as a claim for the general combination and arrangement of the parts described, what is there in it that is new? I may state, in general terms, that there is a mechanism for forming the stitch; and mechanism for holding the material to be sewed, which we denominate the cloth; and a mechanism for feeding the cloth; and all these general elements in combination and in an arrangement set forth in the specification.

Now, we must look at some of the subcombinations, as I should term them. And I do this because a great portion of the argument treated the general combination as if composed only of simple elements, whereas, there may be subcombinations entering into the general combination.

We find, in the first place, the kind of stitch made by Howe, which I shall denominate the interlocking stitch. He uses two threads, and by the mechanism which he describes, he interlocks the threads, forming a loop by carrying the needle and its thread double through the cloth, and then carrying the shuttle and its thread between the needle and its thread through that loop, and thus interlocking the threads as the first step toward forming the stitch. Then we find the holding apparatus, consisting of two surfaces fixed against the cloth; these surfaces being one, one side of the shuttle-box, and the other plate X; the plate X being adjusted according to the thickness of the cloth which is to pass between these two surfaces; and the statement that it is adjusted according to the thickness of the cloth, shows that it is intended to press upon and hold the cloth. These are the holding surfaces—stationary holding surfaces.

Then there is the feeding apparatus, which carries the cloth along between these two surfaces each successive stitch, so as to make a seam. The feeding apparatus consists, as the patentee describes it, of a piece of metal with points projecting, which are to take hold of the cloth. The power is applied to the metal which has taken hold of the cloth by means of its points, and that metal then, by means of mechanism, carries the cloth with it between the two stationary surfaces. Here is one part for the combination of the feeding, consisting of the plate of metal with points; and the other part consists of the rigid surfaces between which the cloth is passed, in feeding, and which aid in keeping it in place while it is fed. That is the subcombination of the holding surfaces with the feeding mechanism, or the mechanism which moves the cloth. The same holding surfaces also perform another office—that of aiding in making the stitch. This in two ways: First, they successively resist the thrust and the retraction of the needle. The thread may pass through the material both ways, without moving it by friction. It is held between these two surfaces, which operate to keep it from yielding to the action of the needle in its thrust and its retraction. Besides this they aid in forming the stitch, by keeping the cloth in the exact line where it is required to be kept when the stitch is tightened, so that the interlocking of the two threads shall be within the body of the cloth, or closely on the side if desired. The cloth is kept in its position independently of the needle and the shuttle, by these two surfaces, which grasp it and hold it exactly in the line where it should be, and prevent it from being displaced by any agitation or concussion, so that the stitch is sure to be made in the proper place.

These are subcombinations which enter into the general combination. Now, how far did they exist before Howe's invention? We have, in the first place, three American patents introduced,—Greenough's, Corlis's, and Bean's.

Bean's was the crimping machine; it had a stationary needle, and the cloth was crimped by cog-wheels and forced upon the needle, and when drawn out would exhibit a seam, which I call the basting-seam—that is, a thread carried through and along on one side, and then through and along on the other. That machine had very little in common with Howe's. There was a mechanism by which the seam could be formed; but the parts and the combinations were different from Howe's. The stitch was different. The holding surfaces were cog-wheels. The general combination was not Howe's.

The other two, Greenough's and Corlis's, may be classed together. They were both substantially machines by which a stitch was made, called the basting-stitch, exactly the stitch that was made by Bean's machine. There were two threads, each of which made precisely the same stitch. It was the stitch made by harnessmakers and shoemakers. The material under operation was held in clamps, and a hole was made through it, and the threads were carried through that hole, and the stitch was tightened, and the material was carried forward in the clamps, and another stitch was made. There was no interlocking of the threads: each thread acted independently and had the same effect as if the other were not used. There being two threads, merely duplicated the effect. That was a different stitch from Howe's. It is not contended that these machines anticipated Howe's; and it is certain that they did not. They are now produced in evidence for the purpose of showing that there was some kind of mechanism existing before Howe's, by which some stitch was made, and that repeated, so as to form a seam, and that thus the three general elements—namely, some mechanism to form a stitch, some mechanism to hold the material, and some mechanism to move or feed it—existed before. But the kind of mechanism in the particulars I have stated, and various others, was unlike Howe's.

We come then, to the other, or foreign inventions, that have been introduced as narrowing Howe's. The first is the publication in Brewster's Encyclopedia, which only comes to this—that an eye-pointed needle had been described before Howe's invention.

The next in point of time, is the Thimonier —a French machine, invented in 1830. The first observation to be made upon that is, that it has no mechanical feed whatever, and therefore lacks one of the general elements of combination that Howe's possessed. And that, of course, is fatal as to its defeating Howe's invention; for it did not contain that essential part of Howe's invention. It was fed merely by hand. How far it contained certain other portions of Howe's, it is impossible to say with certainty from the means that are afforded to the court. We have a translation of the specification, but we have nothing else as evidence. There is a model

produced, not authenticated, and used only as an illustration, as counsel might illustrate by any thing else which they should present to the court; but it is not proved by any expert, mechanician, or otherwise, to truly represent the Thimonier machine described. We have really nothing but the specification. It appears there were holding surfaces in that machine, which resisted the thrust and retraction of the needle, and upon one of which the cloth was fed by hand. Therefore, it had two holding surfaces, performing the office of resisting the thrust and retraction of the needle, and was so far like Howe's; although it is said that the surfaces were very different, one called the foot or nipple, being a mere cylinder surrounding the needle and chamfered down to an edge where it comes down upon the material; but still it seems to have been designed to hold the material down upon the table when the needle, as it is called —crochet-hook, in fact—rises up with the loop of thread through the cloth. Whether or not it held the cloth in place, while the stitch was tightened, has not been satisfactorily shown; nor is it material to the result at which I shall arrive whether it did or not.

The stitch formed in that machine—I call it a stitch because it has been termed so— was different from Howe's; one thread only was used; there was no interlocking of two threads; the thread in loop was brought up through the material, which was laid horizontally upon a table, and then another loop was passed through that loop, and the first drawn close; the first loop being so placed that the second thrust of the needle would pass through it, and so successively. This was the loop-stitch, sometimes called the chain-stitch, being a succession of loops passed one through the other, by a single thread, so that by taking hold of the end of the thread the whole may be pulled out with facility. We have not therefore, Howe's interlocked stitch by means of two threads, nor have we his feeding mechanism in the Thimonier machine.

The next introduced is the English patent of Newton & Archbold, of 1841. That is a patent for ornamenting gloves. The sole purpose for which it was made and used was to put loops of thread upon the backs of gloves as an ornament. The material was held in clamps, and moved with them: and in one modification there was a bent wire pressing upon the fabric against the thrust of the needles, but with no holding surface opposite the wire. A single thread was used, and if it may be said to make a stitch, it was the same as I have already described as made by the Thimonier machine. It had not two threads interlocked. It had not the stationary holding surfaces, with feeding mechanism carrying the material between them as in Howe's. That machine does not anticipate Howe's invention. Experts differ upon the question whether that was a sewing machine. It is insisted by one set of experts

that it makes a stitch, and is, in fact, a sewing machine, though the inventors did not so call it. In order to make a stitch, it is not only necessary that threads should be passed through the material, but the tightening of it is essential; and I do not see evidence that in Newton & Archbold's machine, the thread was tightened, or designed to be, in a manner which would form a stitch, or that the machine possessed the apparatus necessary for that purpose. It was made in 1841. Now, the very gloves, upon which it was used for ornamentation, were required to be sewed; and yet it does not appear that the inventors, or anybody else that ever used it, thought they could sew with the machine.

When it is said that an old machine existed, applicable to a new use; if this want never existed before, we may readily believe that an old instrumentality may meet it; but when the want has always existed, and not only existed but been pressing, and it is said that an old instrument would always have answered the want, the improbability is so great as to require strong evidence to overcome it. Now, sewing is a universal and pressing want, and has always been so. Sewing has been needed from the first pair in the garden of Eden, to the last pair that were ever united. And that, in 1841, a man invented a sewing machine in England, and put it in operation, and did not know it himself; and that all the persons who used it were in fact using a sewing machine without knowing it, is hardly credible. I am not satisfied, from the evidence that it can be deemed a sewing machine, and if it can, it was materially different from Howe's.

We next come to Fisher & Gibbons' machine, letters patent for which were granted in December, 1844, and the specification was enrolled in June, 1845. That machine used two threads, and they interlocked, not exactly in the manner of Howe's; but still there was a mechanism by which one thread was carried by a needle through the material, then another thread was carried by a shuttle between the needle and its thread; and this was repeated in succession. It was not described nor denominated as a sewing machine, but as an improvement in the manufacture of lace. Was that part of Howe's invention, that idea of interlocking the two threads, and the mechanism for carrying that idea into effect anticipated by Fisher & Gibbons' machine? It clearly had not the other parts of Howe's invention, so as to contain Howe's general combination. It had neither the holding surfaces nor the feeding mechanism of Howe. The material was wound from one roller on to another, passing over two bars, and moved in relation to the ornamenting instruments as required by the ornamental figures to be produced. But if Fisher & Gibbons' mode of forming the stitch was in fact the same with Howe's—was it prior, in contemplation of law? This depends upon the construction of our own stat-

ute of 1836, c. 357, §§ 7, 15 [5 Stat. 119, 123]. Howe's invention was completed as early as the middle of May, 1845. His application for a patent was subsequent to June, 1845.

It is contended, that although the patenting abroad may not have been before Howe's invention here, yet, if it was before his application for his patent, it would anticipate Howe's patent. Now, if the same invention had been made, and the same patent had been granted here, the invention not being before Howe's, it would not have defeated Howe's, because, by our law, if Howe was the original and first inventor here, and another person had afterward made the same invention, and, by greater speed, had obtained letters patent before Howe, it would not have precluded Howe from having a patent for his prior invention. And it is extremely improbable, to say the least, that congress intended to give more effect to an invention and patent abroad, than to an invention and patent here.

Upon looking at the statute, and comparing its different sections, I am satisfied that the patenting abroad must be before the invention here, and not merely before the application. The reasoning of the learned counsel for the complainant upon that point is satisfactory, and I do not think it necessary to repeat it. It is also understood that Judge Ingersoll decided that point, in the case of Bartholomew v. Sawyer [Case No. 1,070], in New York, in accordance with the views contended for by the complainant's counsel. I hold that the patenting abroad must be before the invention here, in order to defeat the American patent.

But it is contended that this machine was patented abroad prior to the invention here, although the specification of Fisher & Gibbons was not enrolled until after the invention of Howe here. This raises another, and, so far as I am aware, a new question upon the construction of our own statute. The language of the statute is (section 7, before cited), "that it had been patented or described in any printed publication in this or any foreign country."—and (section 15, before cited)—"had before been patented or described in any printed publication"—"patented in any foreign country." Was this invention of Fisher & Gibbons patented in England before the middle of May, 1845? That depends upon what is to be deemed patenting. What was the patent taken out in December? It was as follows: "Invention of certain improvements in the manufacture of figured or ornamented lace, or net and other fabrics." That was the patent and the whole description; and there is no pretense that it even indicates any invention of a sewing machine.

It is only by virtue of the specification enrolled in June, 1845, that we discover anything as to the stitching mechanism in the machine.

But it is said that when the specification

was enrolled, it took effect from the date of the letters patent, and, therefore, what was specified and enrolled in June afterward, was in fact patented in December, 1844. That is the argument. What is the meaning of the word "patented," in our statute? The English government may give such effect to certain acts of their own as they see fit; they may say letters patent may be granted in general terms, and that the fourteen years they grant may begin at the date of the letters patent, though no specification be enrolled till six months after. That is the law of England—but the question is, what did the congress of the United States intend when they used the words, "patented in any foreign country?" Did they mean that the invention might be patented before it was made? Because under the English law, the letters patent might be granted before the specification was made, and the specification might contain inventions made after the letters patent were granted. There would be some force in the argument, if, by the English law, nothing could be put into the specification but what was invented or known before the letters patent were granted—but that was not so. The truth is, that the patentees had these six months by the terms of the letters patent, to enroll their specification, and during all that time they may have made inventions and improvements; and the very thing that is relied upon here as anticipating Howe, for all that we know, may have been invented after the middle of May, 1845, and put into the specification in June following.

What is meant by congress undoubtedly is, in the first place, that there shall have been an invention; and, in the second place, that it shall have been made patent to the world—patented. Now, we have no satisfactory evidence that the invention was made, and we have positive evidence that it was not made known to the world by being patented, until June, 1845: it was not made patent until after the invention by Howe. I am, therefore, of opinion that Fisher & Gibbons' invention whatever it may have been, was not patented until after Howe's invention, and can have no effect whatever.

Having thus gone through with the prior patents, I next proceed to examine the defendants' machines, and see what there is in them in common with Howe's, and which is new in Howe's.

In some part of the argument, although it was not distinctly stated, it seemed to have been thought that if all the different parts of Howe's could have been found before, in different machines, that would anticipate Howe's. That, of course, can not be maintained, because it is familiar law that a new arrangement, a new combination, may constitute a new invention. If not only all the primary elements, but all the subcombinations, had existed in different machines before, but never before had been brought together to constitute one machine, and

co-operating to produce one result, and Howe had brought them together by invention, producing a useful result, he would be entitled to a patent for such combination and arrangement.

We find, then, to look at the Williams machine, in the first place, that it has two holding surfaces, between which the cloth is fed by mechanism—a piece of metal, taking hold of the cloth and carrying it along between these two surfaces. That is the subcombination of Howe's, so far. And that is one material part of defendant's machine, and found in no machine prior to Howe's; the presser-foot is divided into parts operating alternately, one of which is always upon the cloth, and pressing it down upon the table; one part presses the cloth down upon the roughened feeding surface below; the feeding is done by advancing the roughened surface, and then withdrawing it in the same plane; one part of the presser-foot being raised, that it may not press the cloth down while the roughened surface is retreating; the other part, in the mean time, being down, holds the cloth in position while the first is up; these opposing surfaces are holding the cloth all the time between them, for the operation of tightening the stitch, and for resisting the thrust and retraction of the needle, and keeping the cloth in place while it is fed along.

We find, in the next place, that it has two threads, and forms the stitch by the interlocking of these two threads; and so far—without speaking of the minor mechanism by which this is accomplished—so far, it is like Howe's; and Howe's was not anticipated in that respect by any machine prior to his. These subcombinations are like Howe's. The general combination and arrangement are like Howe's. It is testified by the experts that they are identical; and I see no reason to doubt that statement.

We find, then, that the Williams machine has adopted the general combination and arrangement of Howe's, and some, at least, of the subcombinations of Howe's, in which that machine differs from others. Without undertaking, therefore, to go into the minutiae of the mechanism, the Williams machine, in my judgment, contains so much of Howe's subcombinations, and of his general combination and arrangement, that it is an infringement of his patent.

The Sloat machine, in the first place, differs not substantially or scarcely at all from Howe's, in the holding apparatus. It has two surfaces, the table and the presser-foot. The foot presses on the material which is between that and the table, and which is there fed along by the four-motion-feed, as it is sometimes called, not requiring the presser-foot to rise to enable the roughened surface to return. And the same remark applies here as to the Williams machine, that it has these surfaces holding the material for the same operations—the tightening of the stitch—resisting the thrust and retraction

of the needle, and keeping the cloth in its proper place when it is fed.

As regards the formation of the stitch, the Sloat machine also uses two threads and makes the interlocking stitch. The shuttle is not carried between the needle and its thread, but the thread of the needle is carried around the shuttle, thus producing the interlocking—the stitch being substantially the same as Howe's, and produced by these instruments—the needle and the shuttle having each its thread, one carried through the loop of the other, in the manner I have described.

It is my opinion that the Sloat machine also contains so much of Howe's subcombinations or subordinate parts, and of his general combination and arrangement, that it is an infringement of his patent.

There are other parts of these machines, minor and subordinate, which have been elaborately discussed, upon which I do not deem it necessary to express an opinion. The considerations I have stated are satisfactory to my own mind, without going further.

There are two other machines admitted to have been sold by the defendants, Morton & Dermot—the Gibbs machine and the Johnson machine. The complainant has introduced no evidence to the court that these are similar to his. The Johnson and Gibbs machines have been produced by the defendants for the inspection of the court. The only evidence is the machines themselves. That might be satisfactory in some cases; but I do not think that upon a motion for a preliminary injunction, I should undertake to decide the question of infringement upon my own inspection merely of such minute mechanism, even if I had better optics than I have; not being a mechanician I might fall into mistakes. I do not, therefore, decide that either of these machines infringes. I decline to do so from the want of any evidence upon the subject, except the machines themselves.

It will be observed by the counsel that the conclusions to which I have come, have been thus far independent of any allusion to the trial in England. I think, however, I ought not to close without referring to the case of Thomas v. Foxwell [5 Jur. (N. S.) 37], because that trial was upon this very invention, before the court of queen's bench, under Lord Campbell, chief justice of England, and the conclusion I have reached is confirmed and sanctioned by the instructions given to the jury, and by the verdict in that case. The first claim there was very similar in effect to the claim here. The claim there was for the general arrangement of the machinery described, which produced the result of sewing a seam. Here it is a claim for the combination and arrangement of the parts described (naming some of them), which co-operate to form the seam. The court instructed the jury there, that if the defendants used a substantial part of the plaintiff's combination, which was new, it was an infringement; and this instruction was subsequently revised and sanctioned by the whole court. I have not thought it necessary to determine whether our law goes to that extent.

But it may be asked, was the infringing machine there like the machines of the defendants here? It has been proved that it was the Grover & Baker machine that was sued in the case of Thomas v. Foxwell [supra], by the testimony of Baker, of the Grover & Baker Sewing Machine Company, who was in England and aided in the defense of that suit, and of Wilson, the Englishman, who also aided in that defense.

That the Williams machine is like the Grover & Baker machine, is testified by Wetherell, the superintendent of the Grover & Baker Sewing Machine Company's manufactory. This affidavit is wholly uncontradicted. Williams, the defendant, was himself six or seven years in Grover & Baker's employment, making their machines, and must know whether his own is similar to theirs, yet he has produced no evidence to impair the force of Wetherell's testimony. The decision in England, therefore, was upon a machine like the Williams machine, and is pertinent to the present inquiry.

There is one other ground of defense, namely, acquiescence. As I shall make no order in relation to the Johnson & Gibbs machines, the question of acquiescence applies only to the Williams and the Sloat machines. No one of the affidavits says there has been any acquiescence as to either of those machines. The affiants only say, that there has been some sort of machines making some stitch, which they describe, and they never heard that Mr. Howe claimed that it was his. To affect the rights of the complainant by acquiescence, it should at least be shown what that is in which he has acquiesced. There is direct evidence that he has not acquiesced in any adverse use of the Grover & Baker machine; and that Grover & Baker have paid him large sums for the right to manufacture.

The remaining question is, what order should be made? Under the circumstances, I shall not make an order for injunctions, provided the defendants will give bonds to keep an account and pay over. Howe's patent will expire on the 10th of September next. It may or may not be extended. It is stated that Williams has an establishment in which he is making these machines. If all the rights of Howe can be protected, and indemnity can be secured to him without stopping this manufacture between the present time and the 10th of September, I think the court ought to give him and the manufacturers of the Sloat machine the benefit of the contingency, that at that time they may be allowed to go on without permission from Howe, if his patent should not be extended. And I suppose that such protection and indemnity can be secured to

Howe by defendants giving a bond with sureties to account and pay to Howe such amount as the court shall finally order. Howe is not himself a manufacturer; he sells the right to others to make his machine; and there can be little difficulty in determining what will be an indemnity to him for the use of his patented invention in the manufacture of machines by the defendants. I am inclined to this course, too, because the machines of the defendants are supposed to embrace improvements upon Howe's, which could not be used without also using the original upon which they are ingrafted. These improvements may greatly increase the utility of the machine. The court will not unnecessarily prohibit a party from using his improvements. If the defendants will give security to account and pay to the complainant such sum as the court shall decree, injunctions will not issue.

Mr. Giles: I suppose injunction will issue if sureties are not given.

THE COURT: Yes, that is understood, of course.

Mr. Washburn: What course is to be pursued?

THE COURT: The counsel for the parties will confer as to the bond, and amount, and sureties; and if they differ, they may appeal to the court.

[For claims of the patent of Elias Howe, Jr., see Howe v. Underwood, Case No. 6,775. For other cases involving this patent, see Howe v. Williams, Case No. 6,778, and Hunt v. Howe, Id. 6,891.]